# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

| | |
|---|---|
| SUMMIT 6 LLC, | § |
| | § |
| **Plaintiff,** | § |
| | § |
| v. | §   CIVIL ACTION NO.  7:14-cv-00014 |
| | § |
| HTC CORPORATION, | § |
| HTC AMERICA, INC., | § |
| LG ELECTRONICS, INC., | § |
| LG ELECTRONICS USA, INC., | § |
| LG ELECTRONICS MOBILECOMM | §   JURY TRIAL DEMANDED |
| USA, INC., | § |
| MOTOROLA MOBILITY LLC, and | § |
| TWITTER INC., | § |
| | § |
| **Defendants.** | § |
| | § |
| | § |
| SUMMIT 6 LLC, | § |
| | § |
| **Plaintiff,** | § |
| | § |
| v. | §   CIVIL ACTION NO.  7:14-cv-00106 |
| | § |
| APPLE INC. | § |
| | § |
| **Defendant.** | § |
| | §   JURY TRIAL DEMANDED |
| | § |

## APPENDIX IN SUPPORT OF SUMMIT 6'S SUR-REPLY
### <u>CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

<u>DESCRIPTION</u>                                                                    <u>APPENDIX PAGES</u>

Declaration of Colleen Bloss

     Exhibit 1 –     Dr. Mark Jones' Deposition Excerpts                          2-16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| **SUMMIT 6 LLC,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **CIVIL ACTION NO. 7:14-cv-00014** |
| § | |
| **HTC CORPORATION,** § | |
| **HTC AMERICA, INC.,** § | |
| **LG ELECTRONICS, INC.,** § | |
| **LG ELECTRONICS USA, INC.,** § | |
| **LG ELECTRONICS MOBILECOMM** § | **JURY TRIAL DEMANDED** |
| **USA, INC.,** § | |
| **MOTOROLA MOBILITY LLC, and** § | |
| **TWITTER INC.,** § | |
| § | |
| **Defendants.** § | |
| § | |
| **SUMMIT 6 LLC,** § | |
| § | |
| **Plaintiff,** § | |
| § | **CIVIL ACTION NO. 7:14-cv-00106** |
| **v.** § | |
| § | |
| **APPLE INC.** § | |
| § | |
| **Defendant.** § | **JURY TRIAL DEMANDED** |
| § | |

**DECLARATION OF COLLEEN BLOSS IN SUPPORT OF
SUMMIT 6 LLC'S SUR-REPLY CLAIM CONSTRUCTION BRIEF**

I, Colleen Bloss, do state and declare as follows:

I am an attorney with the law firm of McKool Smith PC ("McKool Smith"), counsel for

Plaintiff Summit 6 LLC ("Summit 6") in this action.  I make this declaration in support of

Plaintiff Summit 6's Sur-Reply Claim Construction Brief, filed herewith.  Unless otherwise

stated, the matters contained in this declaration are of my own personal knowledge and, if called as a witness, I could and would testify competently to the matters set forth herein.

1.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from Dr. Mark Jones' Deposition dated January 29, 2015.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on February 6, 2015 in Dallas, Texas.

*/s/ Colleen Bloss*
Colleen Bloss

# Exhibit 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

************************************************************

SUMMIT 6 LLC,

       Plaintiff,

   -vs-            Civil Action No. 7:14-cv-00014

HTC CORPORATION,
HTC AMERICA, INC.,
LG ELECTRONICS, INC.,
LG ELECTRONICS USA, INC.,
LG ELECTRONICS MOBILECOMM USA, INC.,
MOTOROLA MOBILITY LLC, and
TWITTER, INC.,

       Defendants.

************************************************************

SUMMIT 6 LLC,

       Plaintiff,

   -vs-            Civil Action No. 7:14-cv-00106

APPLE INC.,

       Defendant.

************************************************************


VIDEOTAPED DEPOSITION OF MARK T. JONES, Ph.D.

9:58 a.m. to 2:13 p.m.

January 29, 2015

Blacksburg, Virginia


REPORTED BY:  Rhonda D. Tuck, RPR, CRR

## Page 2

1    Videotaped deposition of MARK T. JONES,
2  Ph.D., taken and transcribed on behalf of the
3  Defendants, by and before Rhonda D. Tuck, RPR, CRR,
4  Notary Public in and for the Commonwealth of
5  Virginia at large, pursuant to Rule 30 of the
6  Federal Rules of Civil Procedure, and by Notice to
7  Take Depositions; commencing at 9:58 a.m., January
8  29, 2015, at Blacksburg, Virginia.
9
10    APPEARANCES OF COUNSEL:
11
12    MCKOOL SMITH, P.C.
13    300 Crescent Court, Suite 1500
14    Dallas, Texas  75201
15    (214) 978-4206
16    paurentz@mckoolsmith.com
17    BY:  PHILLIP AURENTZ, ESQUIRE
18    Counsel for the Plaintiff
19
20
21
22
23
24
25

## Page 3

1    APPEARANCES OF COUNSEL CONTD:
2
3    MCDERMOTT WILL & EMERY, LLP
4    275 Middlefield Road, Suite 100
5    Menlo Park, California  94025
6    (650) 815-7400
7    bjames@mwe.com
8    BY:  BRYAN K. JAMES, ESQUIRE
9    Counsel for Defendant HTC America, Inc.
10
11
12    WILMER CUTLER PICKERING HALE AND DORR, LLP
13    950 Page Mill Road
14    Palo Alto, California  94304
15    (650) 600-5045
16    jimmy.doan@wilmerhale.com
17    BY:  JIMMY T. DOAN, ESQUIRE
18    Counsel for Defendant Apple, Inc.
19
20
21
22
23
24
25

## Page 4

1                      I N D E X
2
3  WITNESS:  MARK T. JONES, Ph.D.
4     Examination by Mr. James..............................6
5
6                    E X H I B I T S
7  Jones Exhibit Number 1.................................12
      Declaration of Mark Jones in Support of Summit 6 LLC's
8     Response to Defendants Opening Claim Construction Brief
9  Jones Exhibit Number 2.................................31
      Patent No.: US 7,765,482 B2
10
11  Jones Exhibit Number 3.................................35
      Demonstrative Timeline
12  Jones Exhibit Number 4.................................37
      Demonstrative Timeline
13
14  Jones Exhibit Number 5.................................38
      Demonstrative Timeline
15  Jones Exhibit Number 6.................................43
      Demonstrative Timeline
16
17  Jones Exhibit Number 7.................................44
      Demonstrative Timeline
18  Jones Exhibit Number 8.................................45
      Demonstrative Timeline
19
20  Jones Exhibit Number 9.................................49
      Demonstrative Timeline
21  Jones Exhibit Number 10...............................69
      Opening Claim Construction Brief on Plaintiff
22     Summit 6, LLC
23  Jones Exhibit Number 11...............................83
      Patent No.: US 6,895,557 B1
24  Jones Exhibit Number 12..............................106
      Patent No.: US 8,612,515 B2
25     9:58 a.m., January 29, 2015)

## Page 5

1
2
3    THE VIDEOGRAPHER:  Good morning.  We
4  are on the record.  This is the recorded video
5  deposition of Mark T. Jones, Ph.D., in the
6  matter of Summit 6 LLC versus LG Electronics
7  Mobilecomm USA, et al., taken on behalf of the
8  defendant.
9    This deposition is being taken place at
10  the Inn at Virginia Tech, January 29th, 2015,
11  at approximately 9:58 a.m.  My name is Ren
12  Angle.  I am a videographer with U.S. Legal
13  Support.  We are located at 901 Prices Fork
14  Road, Blacksburg, Virginia 24061.  Video and
15  audio recording will be taking place unless
16  all other counsel have agreed to go off the
17  record.
18    Would all present please identify
19  themselves, beginning with the witness.
20    THE WITNESS:  Mark T. Jones.
21    MR. JAMES:  Bryan James, from McDermott
22  Will & Emery, representing the HTC entities.
23    MR. DOAN:  Jimmy Doan, with WilmerHale,
24  representing Apple.
25    MR. AURENTZ:  Phillip Aurentz, with

**Mark T. Jones, Ph.D.**
**January 29, 2015**

## Page 38

1   claims, there's nothing that requires Step C to
2   occur after Step B.  Is that right?
3       A.    That's correct.
4       Q.    Is there anything in the patent claims
5   that would prevent Step C from being performed, as
6   depicted here in this timeline, before Step A?
7       A.    I don't think there's anything in the
8   claim that prevents that.
9       Q.    So I think now what we want to do is
10  talk about some of the possibilities with
11  Claims 17 and 18.  So if you can turn to what is
12  now Exhibit 5.  And this adds a further dot.  And
13  I believe it's a red dot in your diagram, and it
14  says, "downloading or storing pre-processing
15  parameters prior to said identification," and this
16  is a composite of the requirements described in
17  Claims 17 and 18.  Is that fair?
18      A.    The word is, is there a step, which I
19  couldn't agree with, but if you want it to just
20  mean that there is a date and time or a time in
21  which that they have been downloaded or they have
22  been stored, that would be fine.
23      Q.    Okay.  Now, is there anything in the
24  patent specification claims or file history that
25  would prevent the downloading or storing or

## Page 39

1   pre-processing parameters to occur before
2   retrieving the information that enables the
3   identification of the user as depicted in this
4   diagram?
5       A.    No.
6       Q.    So a system that was kind of arranged
7   in this way would work?
8       A.    I believe so.
9       Q.    Now, if this were the arrangement of
10  events, Claims 17 and 18 have this phrase, "said
11  identification."  Would you agree with that?
12      A.    Yes.
13      Q.    And if the phrase of "said
14  identification" in Claims 17 and 18 -- strike
15  that.
16          So Claims 17 and 18, the downloading or
17  the storing of pre-processing parameters has to
18  occur prior to said identification.  Is that
19  right?
20      A.    Again, I would have to say they have to
21  have been downloaded or stored prior to said
22  identification.
23      Q.    Now, if this were the order of events,
24  as depicted in Exhibit 5, the downloading or
25  storing of pre-processing parameters would occur

## Page 40

1   before the identification of the user and the
2   identification of digital content.  Isn't that
3   right?
4           MR. AURENTZ:  Objection.  Assumes
5   facts.
6           THE WITNESS:  There's not a step of
7   identifying the user that's expressed in the
8   claims.  And the step is retrieving
9   information that enables identification of the
10  user, but that doesn't indicate that
11  identification of the user has occurred.  In
12  fact -- well, I guess that's the way I would
13  put it.
14  BY MR. JAMES:
15      Q.    Is there anything preventing the
16  identification of the user from taking place after
17  retrieving the information that enables
18  identification of a user?
19      A.    No.  Wait.  Let me just look at this.
20  There's nothing that prevents that.
21      Q.    In patent language formulation, said
22  refers back to an antecedent or a word in a prior
23  claim or within the same claim.  Is that right?
24      A.    Yes.
25      Q.    And so is there anything preventing the

## Page 41

1   said identification in Claim 17 from referring to
2   the word "identification" in Step C?
3       A.    I guess I'm having trouble parsing out
4   what you mean by prevented.  I don't think it is
5   correct.
6       Q.    I understand that your opinion, I
7   guess, expressed in your declaration calls into
8   question whether the identification could refer to
9   identification of a user.
10          My question is, in the use of "said" in
11  drafting patents, is there anything that would
12  prevent that said from referring to -- strike
13  that.
14          In the terms -- with respect to these
15  claims, 13, 17, 18 of the '482 patent, is there
16  anything that prevents said identification from
17  referring to the word "identification" in Step C?
18      A.    As I explained, I don't think it is
19  consistent with the logic of the claim and the
20  steps that are expressed.  I don't know that --
21  well, that would be my opinion.  I'm not sure
22  quite how to interpret prevent.
23      Q.    I think you're getting at the
24  difference, the problem I'm having.  Now, I
25  understand that you think it makes more sense for

**Mark T. Jones, Ph.D.**
**January 29, 2015**

**Page 42**

1   it to refer to identification of digital content,
2   and it makes less sense to refer to identification
3   of a user.
4           But my question is, is there anything
5   that would rule out definitively -- not the right
6   word.  Strike that.
7           Is there anything that would make it
8   legally improper for said identification to refer
9   to the identification of the user in Step C?
10          MR. AURENTZ:  Objection.  Commentary
11  and mischaracterizes his declaration and prior
12  testimony.  Compound.  Vague.  Calls for legal
13  conclusion.
14          THE WITNESS:  I guess, from a technical
15  perspective, I don't think it makes sense for
16  it to refer to the -- for it to refer to
17  identification of a user.
18          With respect to whether there's
19  something that legally prevents it, I don't --
20  I don't know what it would be that would --
21  what legal aspect it would be that would
22  prevent something like that from happening.
23  BY MR. JAMES:
24          Q.    Your objection is of a technical
25  nature.  Would that be a fair characterization?

**Page 43**

1           A.    It's based on my tentacle understanding
2   of the claim and the specification.
3           Q.    So then if there's nothing -- well,
4   okay.
5           I'll just follow up on this while I'm
6   here.  So if you would turn to the next exhibit,
7   which is Exhibit 6.
8           So in Exhibit 6, the red dot that
9   represents downloading or storing pre-processing
10  parameters has moved, and now it occurs between
11  Step C and Step A, so that the order of events,
12  you retrieve information that enables
13  identification of a user, then download or store
14  the pre-processing parameters, then receive
15  identification of a digital content followed by
16  the pre-processing step.  Do you see that?
17          A.    Yes.
18          Q.    Now, in this case, if this were the
19  order then said identification would clearly only
20  relate to the receiving identification of a
21  digital content.  Right?  Because -- would you
22  agree with that?
23          A.    Yes.
24          Q.    Because in that case, the downloading
25  or storing of pre-processing parameters only

**Page 44**

1   occurs prior to the identification of digital
2   content?
3           A.    Yes.
4           Q.    Can you turn to the next exhibit, which
5   is Exhibit 7.  Now, in this one, Step C is
6   represented in a different position.  And the
7   order of events from the start along the timeline
8   is first receiving identification of a digital
9   content, then retrieving information that enables
10  identification of a user, followed by
11  pre-processing step, Step B.  Do you see that?
12          A.    Yes.
13          Q.    Now, we've already discussed that
14  there's nothing that prevents Step C from
15  occurring in this order.  Would you agree with
16  that?
17          A.    As long as the said retrieved
18  information is available prior to the said
19  received identification, yes.
20          Q.    Right.  But this would be just the
21  steps in Claim 13.  Maybe I'm misunderstanding.
22          A.    You are.  The rest of element C or
23  Step C has "said retrieved information being
24  available to said client device prior to said
25  received identification."  So what's being

**Page 45**

1   retrieved in C has to be available in Exhibit 7
2   prior to Step A.
3           Q.    So you're saying that -- are you saying
4   that this diagram does not -- would not be an
5   accurate representation of what is possible under
6   Claim 13?
7           A.    No.  I'm saying that it's incomplete
8   and that it needs to reflect that additional
9   constraint.  In essence, that's not all of Step C.
10  So the action of retrieving in Step C can, indeed,
11  occur where you have it, but there's the
12  additional constraint that's not being reflected
13  there.
14          Q.    That's just that the information that
15  is retrieved in Step C already exists prior to
16  Step A?
17          A.    Or is available to the client.
18          Q.    Available to the client.  Okay.  I
19  understand.  With that understanding, let's look
20  at the next page, Exhibit 8.  Now, again, what
21  we're trying to do -- well, strike that.
22          So in Exhibit 8, again, there's now
23  represented the downloading or storing of the
24  pre-processing parameters, which is described in
25  Claims 17 and 18.

**12 (Pages 42 to 45)**

**Mark T. Jones, Ph.D.**
**January 29, 2015**

---

**Page 50**

1   nothing that prevents the downloading or storing
2   pre-processing parameters from occurring in storing
3   temporal location of events.  Would you agree with
4   that?
5       A.   I guess with the understanding that, as
6   I noted on a couple previous slides, the -- I
7   wouldn't agree with the way Claims 17 and 18 is
8   worded here as requiring a step, and that I also
9   think there's a temporal restriction not on when
10  the retrieving happens but on when the information
11  is being retrieved but available.
12      Q.   But other than that, this is fair?
13      A.   Yes.
14      Q.   Okay.  Now, in this case, the
15  downloading or storing of the pre-processing
16  parameters would occur -- strike that.
17          Now, you would agree that said
18  identification in Claims 17 or 18 could refer to
19  the identification of digital content in Step A in
20  this order of events.  Is that right?
21      A.   I believe it does do that.
22      Q.   Understood.  Given what we've already
23  discussed, I think you would disagree that said
24  identification, even though it occurs prior --
25  rather, the downloading or storing of

---

**Page 51**

1   pre-processing parameters here would -- strike
2   that.
3          The said -- in this order of events,
4   said identification, in your opinion, would not
5   technically make sense to refer to the
6   identification of a user phrase in Step C.  Is
7   that right?
8       A.   Well, and Step C doesn't require an
9   identification.
10      Q.   Right.  That's why I say the word or
11  the phrase "identification of a user" in Step C.
12  You would disagree that said identification refers
13  to that identification of a user in Step C, that
14  use of the phrase "identification of a user" in
15  Step C?
16      A.   I would disagree with that.  Yes.
17      Q.   But you would agree that there is
18  nothing that would legally prevent the patentee
19  from intending said identification in Claims 17 or
20  18 to refer to the phrase "identification of a
21  user" in Step C?
22          MR. AURENTZ:  Objection.  Calls for a
23  legal conclusion.  Asked and answered.
24          THE WITNESS:  Beyond the answers that
25  I -- my answer is pretty much the same as it

---

**Page 52**

1   was before.
2   BY MR. JAMES:
3       Q.   Okay.  I have a few more questions on
4   said identification, but it's been over an hour.
5   Would you like to take a break or keep going?
6       A.   We can keep going on that topic, just
7   wrap that one up.
8       Q.   I'm happy to move away from this.
9           MR. AURENTZ:  Done with this?
10          MR. JAMES:  Yes.
11          THE VIDEOGRAPHER:  12 minutes.
12          MR. JAMES:  Okay.
13  BY MR. JAMES:
14      Q.   If you could turn to exhibit -- to the
15  patent, '482 patent, and can we look at column 4,
16  lines 42 to 45?
17      A.   I'm there.
18      Q.   Now, this paragraph, starting on
19  line 29, discusses some of the information capture
20  capabilities of the Prepare and Post tools.  And
21  in line 42, there's a sentence that begins,
22  "covert information."  It says, "Covert
23  information capture occurs by having the web
24  browser automatically passed to the Prepare and
25  Post tools known information, such as a user ID or

---

**Page 53**

1   password used to access the web page."
2           Do you see that?
3       A.   Yes.
4       Q.   So in this instance, as disclosed in
5   the specification, the identification of the user
6   has already taken place prior to accessing the web
7   page.  Is that right?
8       A.   Well, an identification of user has
9   taken place.
10      Q.   An identification of a user has taken
11  place prior to -- in terms -- strike that.
12          In terms of Claims 13, 17 and 18, an
13  identification of a user has taken place prior to
14  the identification of digital content step and the
15  pre-processing step.  Right?
16      A.   An identification of a user has
17  occurred before those, yes.
18      Q.   So is there anything that precludes the
19  patentee from intending the downloading of --
20  rather, from claiming the downloading of
21  pre-processing parameters prior to a user using an
22  ID or password to access the web page?
23      A.   Can you ask that first part again?
24      Q.   Sure.  Given the scenario that we're
25  looking at in the specification, is there anything

---

**14 (Pages 50 to 53)**

**Mark T. Jones, Ph.D.**
**January 29, 2015**

Page 74

1    the prosecuting attorney of the '482 patent
2    regarding this amendment?
3        A.    No.
4        Q.    So is it your opinion that there really
5    can only be two devices here in this claim, 25,
6    the remote device and the local device?
7        A.    That is how I understand the claim.
8    Well, I guess I should back up and understand your
9    question better.  When you say only two devices,
10   what do you mean?
11       Q.    Well, we have a local device, remote
12   device, and then there's the use of client device.
13   But it's your understanding, based upon the patent
14   specification, file history that there really can
15   only be two devices, not three?
16       A.    I guess the problem I'm having is that
17   in Step B, the parameters are received from a
18   device separate from said client device, so that
19   device that is separate can be another device.  So
20   maybe I'm not --
21       Q.    I see.
22       A.    That's why I'm having trouble with your
23   question.
24       Q.    I understand.  But you believe that
25   there can only be reference to local device and

Page 75

1    remote device in Claim 25?
2        A.    No.
3        Q.    No.  Is that for the same reasons we
4    just discussed, or why not?
5        A.    For the reasons I've given thus far,
6    yes.
7        Q.    Part of my question is this.  You say
8    that there's a typographical error that was
9    introduced during prosecution, and the
10   typographical error is client, the word "client."
11   Right?  It should be local but instead its client?
12       A.    Yes.
13       Q.    Why can't the typographical error, to
14   the extent one exists, be the word "said"?  To
15   clarify, why can't the typographical error that
16   was introduced, to the extent one was introduced,
17   why can't that typographical error be said in
18   place of A?
19       A.    I don't think that's consistent with
20   what the patentees were discussing in the
21   amendments.  It would -- I'm not sure I even
22   understand what it would mean in the context of
23   the invention if that were the case.
24       Q.    Well, here, we're talking about the
25   source of the pre-processing parameters.  Why

Page 76

1    couldn't the patentee have intended the source of
2    the pre-processing parameters to be device
3    separate from a client device?
4        A.    Well, I don't believe that's what's
5    described.  If they wanted to claim that, I
6    suppose there's nothing stopping them.  I don't
7    know that -- I would have to look and see whether
8    there would be a basis for that in the
9    specification.
10       Q.    Well, sitting here today, can you think
11   of any intrinsic evidence that would prevent that,
12   the patentee from claiming that the source of the
13   pre-processing parameters was a client device?
14       A.    That's not what you mean.  The source
15   of -- it would be --
16       Q.    Device separate from a client device.
17   Yes.
18       A.    I don't know that there's any
19   prevention of it.  I don't know if there's any
20   basis for it in the specification.  I would have
21   to look at that.
22       Q.    Do you think there's anything improper
23   about these claims in the '482 patent
24   containing -- strike that.
25             I believe you've talked about how

Page 77

1    certain local device and remote device are used
2    together.  Right?
3        A.    Yes.
4        Q.    And how client device and server device
5    are used together?
6        A.    They are used in like the preambles of
7    the claims, yes.
8        Q.    Is there anything that precludes those
9    terms from being used on the same claim, that
10   those two pairs are not mutually exclusive?
11       A.    Theoretically, I don't think there is
12   anything that would prevent them from being in the
13   same claim.
14       Q.    In fact, there are claims in the '482
15   patent that have some crossover of those two
16   pairs.  Is that right?
17       A.    I would have to look back and see.
18       Q.    For example, on Claim 1 of the '482
19   patent, do you see in the preamble client device,
20   and then in Step A you see receiving
21   pre-processing parameters from a remote device,
22   and at least at the end of Step C there is
23   reference to a server device.  Right?
24       A.    Yes.
25       Q.    So again, just to follow up, there's

**Mark T. Jones, Ph.D.**
**January 29, 2015**

**Page 78**

1  nothing wrong with mixing and matching from those
2  two pairs of terms?
3      A.   No, there's not, as long as there's a
4  basis for it.
5      Q.   Now, in discussing, you know, what
6  should have been the claim language in Claim 25,
7  if we changed the word "client" to "local," that
8  would be -- would you agree that that would alter
9  the scope of the claim?
10     A.   I don't -- unless I have an
11 understanding of what said client device refers
12 to, it's difficult -- I don't know how I compare
13 the scope with the claim.  I have an understanding
14 it applies to said local device, so I have an
15 understanding of the claim as it's written.  And
16 if it's just said client device on its own and you
17 preclude such an understanding, then I'm not --
18 I'd have to know what it meant to have the scope.
19     Q.   I understand.  Now, if we went with
20 this other suggestion that the typographical error
21 was said for A and we changed the language to say
22 that the pre-processing parameters received from
23 the device separate from a client device, that
24 would alter the scope of the claims.  Do you agree
25 with that?

**Page 79**

1      A.   So as compared to if I look at the
2  alternative of said client device referring to
3  said local device and the other alternative being
4  said client device referring to a client device --
5      Q.   Uh-huh.
6      A.   -- I believe it would.
7      Q.   You said you analyzed, you first
8  analyzed Claim 25 of the '482 patent, at least a
9  couple of years ago.  Right?
10     A.   Yes.
11     Q.   And you analyzed that claim, at least
12 during the pendency of the Samsung litigation?
13     A.   Yes.
14     Q.   Did you at any time during that time
15 period inform Summit 6 of this supposed
16 typographical error?
17     A.   I probably discussed -- I'm not sure
18 one or the other what I discussed, but I would
19 have -- it's something -- well, I don't recall for
20 sure whether I discussed it with Summit 6's
21 counsel or not.  I wouldn't -- unless I'm seeing
22 it in person, I wouldn't reach out to Summit 6
23 directly on any issue because of concerns about my
24 role as an outside expert and them as company
25 people and I have information that they are not

**Page 80**

1  meant to have.  So I -- any -- that style of
2  communication would have occurred through the
3  attorneys, but I don't recall whether it was
4  discussed or not.
5      Q.   Do you have any knowledge of whether
6  Summit 6 was aware of this alleged typographical
7  error?
8      A.   Not that I recall.  I don't know if it
9  came up in some way in the previous case, but I
10 have no recollection of them knowing about this,
11 but I just don't know.
12     Q.   Are you aware of any efforts by
13 Summit 6 to seek a correction or certificate of
14 correction from the PTO regarding this
15 typographical error?
16     A.   No.  And I typically stay away from
17 anything that involves prosecution.  I don't know
18 if that involves prosecution, but I don't think I
19 would know that.
20     Q.   This is related, but are you aware of
21 any efforts by Summit 6 to inform the PTO of this
22 alleged typographical error?
23     A.   I don't know.  I don't think I would
24 know.
25     Q.   Okay.  Are you offering an opinion in

**Page 81**

1  your declaration or here today that Summit 6 meets
2  all the legal requirements of seeking a judicial
3  correction of this claim language?
4      MR. AURENTZ:  Objection.  Calls for a
5  legal conclusion and outside the scope of his
6  declaration.
7      THE WITNESS:  I guess I have an
8  understanding of what the claim means.  I also
9  believe that it's an obvious error that's
10 easily correctable by looking at the claim and
11 then the file history.  But if that meets the
12 standard, then that meets the standard, but
13 that's -- that's the extent of my opinion.
14 BY MR. JAMES:
15     Q.   And I guess that's my question.  Is it
16 within the scope of your declaration that you're
17 opining that Summit 6 meets the legal requirements
18 for seeking judicial correction?
19     A.   Nothing beyond what I've said just now.
20     Q.   And similarly, is it within the scope
21 of your opinion that Summit 6 meets the legal
22 requirement in seeking correction of the claim
23 language from the PTO?
24     MR. AURENTZ:  Objection.  Calls for a
25 legal conclusion.  Outside the scope of his

**21 (Pages 78 to 81)**

**Mark T. Jones, Ph.D.**
**January 29, 2015**

Page 82

1    declaration.
2         THE WITNESS:  Beyond what I've said, I
3    don't know, and I don't know -- I don't know
4    what would be -- what are the circumstances
5    under which you can -- all circumstances which
6    you can and cannot seek correction from the
7    PTO.  I just don't know.
8    BY MR. JAMES:
9         Q.    I just wanted to make sure I understood
10   what the scope of your opinion was.
11        I want to turn to, I guess, media
12   object identifier.  Would you like to take a break
13   now?  How are you guys feeling about lunch?
14        A.    I'm fine to keep going.
15        MR. AURENTZ:  I know we have the
16   2:30 issue.  So if you think we can crank
17   through and get done before then, I'm happy to
18   do that.  If not, then I'll leave it to
19   Dr. Jones to tell us when he's hungry.
20        MR. JAMES:  I will also leave it to
21   Dr. Jones to tell us when he's hungry and need
22   a break.  I'm happy to take a break now or
23   keep going.
24        THE WITNESS:  I'm fine to keep going.
25   BY MR. JAMES:

Page 83

1         Q.    So I want to discuss media object
2    identifier, "media object identifier" term a
3    little bit.  The phrase "media object identifier"
4    occurs in the '557 patent.  Is that correct?
5         A.    Yes.
6         MR. JAMES:  In case this comes up,
7    let's go ahead and mark the '557 patent.
8         (Jones Exhibit Number 11 is marked for
9    identification.)
10   BY MR. JAMES:
11        Q.    Now, Summit 6 has taken the position
12   that media object identifier should receive its
13   plain and ordinary meaning.  Is that right?
14        A.    Yes.
15        Q.    It's also your opinion that media
16   object identifier should receive its plain and
17   ordinary meaning for this case.  Is that also
18   right?
19        A.    Yes.
20        Q.    Okay.  Now, media object identifier,
21   it's not a term of art in computer science.  Is
22   it?
23        A.    It's not a phrase that, as a whole,
24   that's used all over the place, certainly.
25        Q.    I mean, if we looked that up in a

Page 84

1    dictionary of computer science, we probably
2    wouldn't find media object identifier.  Is that
3    fair?
4         A.    I wouldn't be surprised if we didn't.
5         Q.    Okay.  To your knowledge, does media
6    object identifier refer to any particular
7    structure in a programming language?
8         A.    What do you mean by that, by "structure
9    in a programming language"?
10        Q.    If we looked up the specification or
11   documentation on any of the number of languages,
12   does -- is there any one that you know of where
13   media object identifier is included in that?
14        A.    I wouldn't expect a phrase like that to
15   be part of a language.
16        Q.    And it's not in any of the languages
17   that you are familiar with?
18        A.    That wouldn't be how a computer
19   language is described.  Terms like that appear in
20   things like the frameworks associated with
21   languages, but the language, itself, that seems
22   unlikely.
23        Q.    Is media object identifier included in
24   any of the frameworks of computer languages that
25   you are familiar with?

Page 85

1         A.    It may be in the descriptions.  I don't
2    know one way or the other media object is, but it
3    would be pretty -- a phrase -- if you're talking
4    about something that's actually in an API, it's
5    pretty -- you may describe the API using a phrase,
6    but it would be unusual to have a phrase that has
7    spaces in it.  This isn't the way one denotes a
8    particular API call, generally, in computer
9    languages.
10        Q.    Okay.  But you can't think of any API
11   calls in any languages that you're familiar
12   with -- well, strike.  I understand your answer, I
13   think.
14        The sum analysis of the patent in file
15   history would be required to understand what a
16   media object identifier is.  Is that fair?
17        A.    Yes.
18        Q.    So I'll go ahead and ask it.  What is
19   the plain meaning, plain and ordinary meaning of
20   media object identifier?
21        A.    The media object identifier is software
22   that is then defined in the claims, and the claims
23   tell you what it is and what it does, the claims
24   that are at issue.
25        Q.    Okay.  Well, let's look at some of the

22 (Pages 82 to 85)

**Mark T. Jones, Ph.D.**
**January 29, 2015**

**Page 86**

1  things that you mentioned that define and explain
2  what a media object identifier is and does.  Let's
3  look specifically at Paragraph 46 of your
4  declaration.
5       In Paragraph 46 of your declaration,
6  you state that a media object identifier -- this
7  is in 46A, that a media object identifier includes
8  a graphical user interface.  Is that right?
9       A.   Yes.
10      Q.   Would you say that a media object
11  identifier is an interface?
12      A.   It includes an interface, but it's more
13  than that.
14      Q.   Okay.  Just very briefly, I want to
15  refer back to Exhibit 10, which is Summit 6's
16  opening brief.  On Page 33, second full paragraph,
17  it starts with "second, the specification
18  repeatedly confirms the understanding that a media
19  object identifier is an interface for acquiring
20  and pre-processing a media object."
21       Do you agree with that statement?
22      A.   As long as that's not all it is, yes.
23      Q.   In what way is it an interface?  And
24  specifically as opposed to providing an interface.
25  In what way could you say that media object

**Page 87**

1  identifier is an interface?
2       A.   It includes a user interface that
3  allows you to acquire a media object.
4       Q.   Like I said, the media object
5  identifier is more than that, it's more than an
6  interface?
7       A.   Yes.
8       Q.   You also say -- let's go back to your
9  declaration, 46B.  You state that "Media object
10  identifier is a computer software that can be
11  embedded in a website."  Is that right?
12      A.   Included or embedded in a website, yes.
13      Q.   In 46C, you state that "The media
14  object identifier must be capable of
15  pre-processing media objects."  Is that right?
16      A.   Yes.
17      Q.   So one of the things that it has to do
18  is pre-process media objects?
19      A.   Yes.
20      Q.   Would you agree that that's a
21  functional definition?
22      A.   It's a function it has to perform.
23  Yes.
24      Q.   In 46D, you state that "The claims
25  provide additional limitations that further define

**Page 88**

1  what the media object identifier of a claim must
2  be capable of."  Is that right?
3       A.   Yes.
4       Q.   What capabilities are those?  And I
5  guess I would say can you give that answer without
6  reading every single claim, or do you have it in
7  your mind what those capabilities are?
8       A.   What I had in mind was the limitations
9  that are further introduced about what it
10  describes.  So I would have to go through the
11  claims to show you each one of those.  That's how
12  I would do it.
13      Q.   I don't think any of us want to do that
14  on the record right now.  Now, in Paragraph 40 --
15  I'm sorry, one second.
16       Paragraph 48 of your declaration, you
17  state that "The media object identifier must
18  include a graphical user interface for acquiring
19  media objects, such as photo, video and audio
20  files"?
21      A.   Yes.
22      Q.   That's -- that seems to be a repeat of
23  what we said earlier in 46.  Is that any different
24  from -- yeah.  I'm sorry, in 46A?
25      A.   I think it's providing more detail.

**Page 89**

1       Q.   Okay.
2       A.   In the entire paragraph.
3       Q.   I see.  Okay.  Such as media objects,
4  such as photo, video or audio files and
5  pre-processing them in preparation for
6  transmission elsewhere?  Is that the detail you're
7  referring to?
8       A.   Yes.
9       Q.   All right.  And in Paragraph 49, you
10  list again several examples of how media object
11  identifiers operate.  So in A, again, they provide
12  a graphical user interface for placing and
13  associating a media object from a user's desktop
14  onto a web page.  Do you see that?
15      A.   Yes.
16      Q.   And in B, "Media object can be
17  associated with a media object identifier in two
18  ways through drag-and-drop behavior or by clicking
19  and browsing for files."  Do you see that?
20      A.   Yes.
21      Q.   So with that last point, is it fair to
22  say that the graphical user interface must enable
23  those features?
24      A.   Which graphical user interface are you
25  referring -- I believe those are done through a

23 (Pages 86 to 89)

Page 90

1    graphical user interface in part of the preferred
2    embodiment.  That's correct.
3        Q.    Okay.  But I guess my question is, in
4    your view, based upon the disclosure in the
5    specification, a media object identifier must
6    enable drag-and-drop behavior and clicking and
7    browsing for files?  Is that right?
8        A.    No.
9        Q.    What's wrong with that?
10       A.    I don't -- that would put a -- that
11   would restrict the graphical user interface to
12   only those operations.
13       Q.    Okay.  Well, without restricting the
14   media object identifier to those operations, would
15   you say must be capable of those operations?
16       A.    No.  My recollection is they're claims
17   that would indicate that those don't have to be
18   included in the scope of the claim.
19       Q.    So sometimes it does, sometimes it
20   doesn't, enable drag-and-drop, for example?
21       A.    Yes.  I think the specification makes
22   it clear that those are two alternatives.
23       Q.    And the other alternative being
24   clicking and browsing for files?
25       A.    Yes.

Page 91

1        Q.    Both of those are ways of -- I guess
2    both of those, say, are input mechanisms.  Is that
3    fair?
4        A.    Yes.
5        Q.    Can a media object identifier receive
6    input in other ways other than drag-and-drop and
7    click to browse?
8        A.    I believe it could.
9        Q.    Which ways are those?
10       A.    I would have to consider a specific
11   method and see whether it was -- met the elements
12   or not, but I don't have in mind a list of all the
13   possible ways it could be done, but I don't see
14   something that limits it to only those two.
15       Q.    Are there any input mechanisms that are
16   excluded from a media object identifier?
17       A.    I think it would depend on the claims,
18   but, again, I haven't considered what -- if it
19   meets the claim limitations, then it meets the
20   claim limitations.  The claim limitations describe
21   what the -- well, it's redundant, but they
22   describe what the limitations are.
23       Q.    Sure.  Now, you state that "The media
24   object identifier can be implemented using ActiveX
25   controls."  Is that right?

Page 92

1        A.    Yes.
2        Q.    You also said that, "ActiveX provided
3    built-in capabilities that supported interactions
4    of the type described in the specification."
5    Correct?
6        A.    Yes.
7        Q.    Which built-in capabilities are you
8    referring to?
9        A.    The ability to have an ActiveX control
10   within a web browser interact with a -- be
11   interacted with be a drag-and-drop.  So the
12   controls, themselves, would allow a programmer to
13   respond to events that are from a mouse, such as
14   drag-and-drop.
15       Q.    Now, you said earlier that ActiveX is a
16   framework.  Right?
17       A.    Yeah.  That's how I would describe it.
18       Q.    And you could implement an ActiveX
19   control using several languages?
20       A.    Yes.
21       Q.    You could do it in C++?
22       A.    That's my recollection, yes.
23       Q.    Visual C++?
24       A.    I don't know that that's any different
25   than anything else.

Page 93

1        Q.    Visual Basic?
2        A.    Yes.
3        Q.    Java?
4        A.    I don't recall that -- I don't
5    recollect it was -- that there's support for that
6    one.  I don't think it was.
7        Q.    Okay.  Are there any other languages
8    that you recall you could implement ActiveX
9    controls in?
10       A.    I think it was like maybe VBScript.  I
11   don't recall the time frame on that, but that may
12   be.  And then I think there was another scripting
13   possibility.  I don't recall the name of it.
14       Q.    Okay.  A programmer who wanted to
15   implement drag-and-drop features on an ActiveX
16   control would have to code that.  Right?
17       A.    The ActiveX framework would provide you
18   with the event, and then it would be the
19   programmer's responsibility for how to -- what
20   they wanted to do in response to a drag-and-drop
21   event.
22       Q.    I see.  And they could program that
23   response in any of the languages we just spoke of.
24   Right?
25       A.    Yeah, I don't think -- I don't think

**Mark T. Jones, Ph.D.**
**January 29, 2015**

Page 98

1  say that, "One of ordinary skill in the art would
2  also look to the code in Appendix A, as well as
3  the description of this in the prose of the
4  specification."  Do you see that?
5      A.   Yes.
6      Q.   All right.  Now, on the '557, so the
7  patent, if you look at Appendix A, I believe it
8  starts at column 7.  Is that right?
9      A.   Yep.
10     Q.   Okay.  Can you show me or point out in
11  Appendix A where the media object identifier is?
12     A.   This code describes configuring it and
13  then making calls that invoke it on the page as
14  well as the code to download it.  It doesn't give
15  you the code within the media object identifier
16  itself.
17     Q.   So in Appendix A, there's just the call
18  to something that would potentially be the media
19  object identifier?
20     A.   There's the call.  There are the
21  parameters to it.  There is the description of it
22  and the ways in which it interacts with -- within
23  the context of the web page.
24     Q.   So again, that's -- the media object
25  identifier is, would you say it's something that's

Page 99

1  included or embedded in -- or could be included or
2  embedded in a script such as Appendix A?
3      A.   I'm not sure what you mean.
4      Q.   Right.  Strike that.  Let me think
5  about that one.
6          Let me just move away from that to
7  Paragraph 51 of your declaration.  Paragraph 51
8  says that, "The media object identifier acquires
9  media objects, for example" -- "using, for
10  example, the filename and url information."  Do
11  you see that?
12     A.   Yes.
13     Q.   So again, this is a capability that the
14  media object identifier must have.  Is that right?
15     A.   When you say "this is a capability," I
16  guess, what are you referring to as the
17  capability?
18     Q.   Acquiring media objects using, for
19  example, the filename and url information.
20     A.   It needs to have a way of -- I don't
21  believe that the only way it has to do it.  And it
22  can use a filename to store the media object
23  that's been identified to it by, for example,
24  drag-and-drop or click to browse.
25     Q.   So it can acquire media objects using

Page 100

1  the filename and url information, but it doesn't
2  necessarily have to be able to.  Is that what
3  you're saying?
4      A.   I don't believe the independent
5  claims -- my recollection is they don't require
6  that it do it in that particular way or that the
7  media object identifier must include a filename.
8  I don't believe that's a restriction.
9      Q.   So a person of skill in the art looking
10  at the specification and seeing these citations
11  and support that you identify, what are they to
12  make of that?  That it must be capable of this?
13  That it can be capable of this?
14     A.   That this is an example of how the
15  media object identifier in the preferred
16  embodiment operates.
17     Q.   But it's your opinion it's not limited
18  to those methods?
19     A.   I don't believe that the claim language
20  of at least the independent claims limits the
21  media object identifier to operate in those ways.
22  If the -- I don't believe it's limited in that
23  functionality, and if the -- if you were to take
24  the point of view, which I think is incorrect, I
25  don't believe that this is a means-plus-function

Page 101

1  claim, so I don't think it's limited to the
2  structure that's disclosed in the specification.
3      Q.   We're not at means-plus-function yet,
4  but -- and again, we're still, as far as I'm
5  concerned, trying to figure out what the plain and
6  ordinary meaning of media object identifier is.
7          So within that context, a person of
8  skill in the art reading these citations and
9  seeing this information, is it your position that
10  such a person would understand that there's no
11  limit to the type of input that -- input methods
12  that's available through a media object
13  identifier?
14     A.   No.  First of all, it has to be a
15  graphical user interface, so I don't think there's
16  no limit to it.
17     Q.   But within a graphical user interface,
18  there are multiple methods of receiving input that
19  could potentially identify a media object.  Right?
20     A.   Yes.
21     Q.   And one example is by using filename
22  and url?
23     A.   Yes.  For example, you could, forward
24  the filename that is delivered to it, be a
25  drag-and-drop or the graphical browser.

26 (Pages 98 to 101)

**Mark T. Jones, Ph.D.**
**January 29, 2015**

---

Page 114

1   It sounds to me like you're basically
2   just restating the function with another function,
3   as opposed to a structure.
4       MR. AURENTZ:  Objection.  Compound.
5   Vague.  Is there a question?  You made two
6   statements there at the end.  I'm not sure
7   what the pending question is.
8       MR. JAMES:  Fair enough.
9   BY MR. JAMES:
10  Q.   Just to restate, you've said that the
11  disclosed structure for performing the function of
12  enabling receipt of an identification of an image,
13  video or audio file is the portion of the media
14  object identifier which provides the functionality
15  of receiving the identification of an image, video
16  or audio file, I'm paraphrasing.
17       How is that more than just restating
18  the function?
19  A.   The -- what I'm talking about there is
20  that the media -- in the context of the preferred
21  embodiments, which I go on to describe below, it
22  describes how that's done two ways that can be
23  done in the media object identifier.
24       So it's saying that this is what the
25  media object identifier does and here are two ways

---

Page 115

1   it accomplishes that.
2   Q.   Okay.  But there's -- when you talk
3   about the drag-and-drop feature, in the
4   specification, there's no disclosure of how that
5   functionality takes place or is implemented.
6   Right?
7   A.   I wouldn't agree with that.
8   Q.   How so?
9   A.   I believe, first of all, the
10  specification describes how the media object
11  identifier itself is sized.  It then describes the
12  process by which it responds to detect the --
13  describes the process of interacting with the
14  user, which would include detecting that the mouse
15  is over the media object identifier, And then when
16  the user releases their mouse, at that point,
17  detecting that event, as well.
18  Q.   Right.  So that's a disclosure of the
19  interaction between the user and the media object
20  identifier.
21       But what I was asking was, there's no
22  disclosure of how the drag-and-drop functionality
23  itself is implemented in code, for example?
24  A.   Right, and that's not the requirement
25  because the function isn't drag-and-drop.  The

---

Page 116

1   function is what is the structure -- I have a
2   function, and I need to implement, or I have an
3   algorithm for doing that, and this is describing
4   that algorithm.
5   Q.   But the algorithm that you're
6   describing is use drag-and-drop functionality.  Is
7   that fair?
8   A.   No.
9   Q.   Okay.  Well, I don't understand.
10  A.   The specification describes, first of
11  all, that this is a media object identifier, that
12  it is sized according to parameters it receives,
13  that it is displayed on the pages as disclosed
14  separately for ActiveX and Java in Figures 1 and
15  2.  It describes the user interaction, which is
16  specifically would be detecting that the mouse
17  pointer is over the display of the media object
18  identifier, and then the interaction -- that the
19  user releases their button, so both of those
20  events are detected in the drag-and-drop
21  operation.
22  Q.   And that is the extent of the algorithm
23  for accomplishing function, in your opinion?
24  A.   That allows the acquisition of the --
25  the identification of the media object.  It

---

Page 117

1   also -- the specification also describes a
2   filename that is -- it's described as an object
3   that stores the name of the identified file, and
4   then it also describes the capability of the media
5   object identifier to -- how it can receive
6   information about, for example, an account, like a
7   user ID or password.
8   Q.   And so -- what I'm hearing is it can
9   accomplish this by performing -- by using certain
10  of these features, like drag-and-drop or the url.
11       Just so we're clear, there's no further
12  step-by-step explanation or other kind of
13  algorithm for how those objects like -- or how the
14  media object identifier performs the function,
15  beyond what you just described?
16  A.   Beyond the steps I described that
17  performed the function, it doesn't disclose, for
18  this particular embodiment, it does not disclose
19  another layer of disclosure of those steps, so it
20  discloses steps for an algorithm.  It doesn't
21  disclose the steps of the step of an algorithm.
22  Q.   I think I understand what you're
23  saying.  So, for example, it discloses -- you're
24  asserting that the algorithm includes using, for
25  example, drag-and-drop functionality, but the

---

30 (Pages 114 to 117)

**Mark T. Jones, Ph.D.**
**January 29, 2015**

| | |
|---|---|
| **Page 118** | **Page 120** |

**Page 118**

1  patent doesn't further describe how the
2  drag-and-drop functionality is itself implemented?
3  Another layer of description below that?
4       A.    I think it describes the operation of
5  the drag-and-drop functionality.  It doesn't
6  describe another level below that.
7       Q.    Okay.  And similarly, with click to
8  browse.  It describes using click to browse, but
9  it doesn't actually -- it doesn't go beyond that
10  to describe how the click to browse works or is
11  implemented?
12       A.    It describes steps in click to browse.
13  It doesn't go on to further describe each step.
14       Q.    And in your opinion, that is
15  sufficient -- well, scratch that.
16       Look at Paragraph 62, your declaration.
17  You cite to, at least to Figures 1 and 2 of the
18  '515 patent.  Take a look at Figures 1 and 2.  Do
19  you have Figure 1?
20       A.    I do.
21       Q.    Let's look at Figure 1.  This is
22  purported to be a diagram of the exemplary web
23  page.  Is that right?
24       A.    Yes.
25       Q.    And the media object identifiers are

**Page 119**

1  the boxes in the middle that says, for example,
2  "drag photo here in front view."  Is that correct?
3       A.    Yes, at least the graphical user
4  interface associated with the media object
5  identifier.
6       Q.    Right.  Is there a particular HTML
7  element that's depicted here with the graphical
8  user interface?
9       A.    My recollection is that this is
10  referring to the ActiveX control.  I would get
11  that from the fact that it's a drag
12  implementation, as opposed to Figure 2, which is a
13  click implementation.  I don't know if it
14  describes it more specifically than that or
15  whether that -- well, that would be my reason for
16  why I believe one is the ActiveX control and one
17  is referring to the Java control in the preferred
18  embodiment.  But I don't recall whether it's
19  specifically called out that way.
20       Q.    Figure 1 and Figure 2, just in and of
21  themselves, without the explanation, they don't --
22  you can't look at them and say oh, that's an
23  ActiveX control.  Could you?
24       A.    Unless ActiveX was the only thing that
25  would let you do drag-and-drop in that time frame

**Page 120**

1  in a web page, then I can't think of why.
2       Q.    And similarly, with Figure 2, just
3  looking at Figure 2 doesn't tell you that this is
4  a Java applet or some other kind of component.  Is
5  that fair?
6       A.    The picture alone wouldn't tell me
7  that.
8       Q.    Does the picture alone tell you how --
9  does the picture alone give you an algorithm for
10  how to accomplish identifying the digital content?
11       A.    No.
12       Q.    As long as we're on the figures, let's
13  look at Figure 3.  Now, in Paragraph 63 of your
14  expert report, you state at Figures 3 and 4 and
15  4B, for that matter, "Provide further structural
16  details regarding the filename that identifies the
17  digital content."  Do you agree with that?
18       A.    Yes, they do.
19       Q.    And specifically, you note the
20  SubmitMediaRequest function in, I guess, it's
21  Figure 4?
22       A.    Yes.
23       Q.    Where in Figure 3, 4A, or even 4B is
24  there disclosed an algorithm or detailed
25  explanation for -- how the SubmitMediaRequest

**Page 121**

1  function enables identification of a file?
2       A.    What the SubmitMediaRequest is showing
3  is that the -- it allows the association of the
4  identified object with the account.  That's the
5  purpose of citing to that.
6       Q.    Now, SubmitMediaRequest, though, here,
7  in Figure 4A, all it discloses is the signature
8  for calling that function.  Isn't that right?
9       A.    Yes, and what that signature is saying,
10  since we know that is what is in a preferred
11  embodiment call to upload the image, that this is
12  the indication that the identified structure is
13  capable of receiving the identification of the
14  media object for the purpose of associating it
15  with an account, and that's what -- this is
16  indicating that's precisely what was done.
17       Q.    So in your opinion, this is a structure
18  that would satisfy the means-plus-function claim?
19       A.    It's showing -- this is a portion that
20  shows that it's -- that the function isn't just
21  receiving identification and doing whatever you
22  want, right?  It's -- to paraphrase it, there has
23  to be a receipt of the information that is to be
24  associated with said account, and this is
25  indicating how that is associated with said

APPX - 14

## Page 126

1  on how to put those media object identifiers in
2  groups on the same page.  So I wouldn't agree with
3  that.
4     Q.    But there's no further level of
5  explanation how to accomplish the function using
6  batch interface?
7     A.    Beyond what I've identified, I don't
8  believe so.  Any algorithm is going to describe
9  steps at meaningful levels.  At some point you
10 can't just keep describing each one in further
11 detail until you get down to computer
12 instructions.  Short of giving source code, I
13 don't think -- I can't imagine giving much more
14 structure than this.
15    Q.    In a lot of these cases, the algorithm
16 that you describe is basically to use kind of a
17 feature of computer programming, such as
18 drag-and-drop or click it to browse, but there's
19 not an algorithm for how to implement that
20 feature.  Is that right?
21    A.    I would say first, the function isn't
22 just -- the algorithm isn't limited merely to do
23 drag-and-drop.  It describes how the drag-and-drop
24 operates.  It describes it being within a
25 particular framework.  It describes the ability to

## Page 127

1  control the size of the user interface that's
2  provided.  It describes precisely the operation of
3  the drag-and-drop.
4     It doesn't go into further detail to
5  say here is the code that processes that
6  particular event, but it certainly describes an
7  algorithm that is sufficient to tell one how to do
8  this.
9     Q.    Is that because a person of skill in
10 the art would understand how to do it, based upon
11 that description, in your opinion?
12    A.    I think a person of skill in the art
13 would understand this is an algorithm is disclosed
14 here, and actually, alternative algorithms are
15 disclosed here, and that one of ordinary skill in
16 the art would be able to implement that algorithm.
17    I mean, short of actually giving the
18 source code, I don't think there's much more you
19 would say.
20    Q.    And in your opinion, it's not necessary
21 to provide that source code?
22    A.    That's correct.  And I think that the
23 standard also doesn't say you have to provide
24 source code.
25    Q.    Fair.  Source code or any other further

## Page 128

1  detailed description.  Would you agree that you
2  don't think any further detailed description is
3  required regarding how to implement some of these
4  features, like drag-and-drop, click to browse,
5  batch interface, the SubmitMediaRequest function?
6     A.    What I would say is that an algorithm
7  has been disclosed, and that algorithm is
8  sufficient structure, and it's disclosed in
9  sufficient detail to tell me what that structure
10 is.
11    Certainly there are -- and it's a
12 particular way of doing this function, and the
13 function isn't drag-and-drop.  The function is,
14 paraphrasing, it's receiving identification.
15    Q.    And so in order to accomplish the
16 function of receiving the identification, in your
17 opinion, it's sufficient to disclose, for example,
18 the SubmitMediaRequest function without providing
19 implementation details or steps of how that
20 SubmitMediaRequest function operates?
21    A.    SubmitMediaRequest isn't even -- the
22 identification has already been received by that
23 point, so the entire purpose of showing
24 SubmitMediaRequest, particularly in light of the
25 specification, is to indicate that the

## Page 129

1  identification of the media object is received to
2  be associated with an account, and that's an
3  example of a subroutine call that includes both
4  the media and the account.
5     Q.    I see.  And it's your opinion that the
6  disclosure of click to browse feature is
7  sufficient structure for accomplishing -- for
8  enabling the receipt of identification on a media
9  file, without providing any further implementation
10 details regarding that click to browse feature?
11    A.    Yes, because it's describing in detail
12 what the system is going to do to receive that
13 media object identifier.  I'm sorry, to receive
14 the media object.
15    MR. JAMES:  Take a short break?
16    MR. AURENTZ:  Before we go off the
17 record, you were talking earlier about his CV
18 not being in the filing.
19    MR. JAMES:  Yes.
20    MR. AURENTZ:  And we've recently just
21 corrected that appendix.  I don't know if you
22 all saw the ECF go through.
23    MR. JAMES:  Is that today?
24    MR. AURENTZ:  Yeah.  If you want his
25 CV, for purposes of the deposition, it's the

**33 (Pages 126 to 129)**

Mark T. Jones, Ph.D.
January 29, 2015

## Page 130

1  same one you got back in July when we
2  disclosed him as an expert.  So you already
3  have it.
4      MR. JAMES:  Okay.
5      MR. AURENTZ:  It's just it wasn't with
6  the filing.  If you want to test his
7  qualifications or whatever, you know, we have
8  it available such that you can do that.
9      MR. JAMES:  All right.  I appreciate
10  that, and I don't think I need it for this
11  deposition.
12      MR. AURENTZ:  Okay.
13      THE VIDEOGRAPHER:  The time is
14  approximately 2:08 p.m., and we are going off
15  the record.
16      (Break in proceedings.)
17      THE VIDEOGRAPHER:  The time is
18  approximately 2:13 p.m., and we are back on
19  the record.
20      MR. JAMES:  I think that's all the
21  questions I have at this time.  I pass the
22  witness.
23      MR. DOAN:  Nothing from Apple.
24      MR. AURENTZ:  No questions.
25      THE VIDEOGRAPHER:  If there are no

## Page 131

1  further matters, the time is approximately
2  2:13 p.m., and this deposition is concluded.
3  Thank you.
4
5      (Deposition adjourned at 2:13 p.m.)
6
7      (Signature reserved)
8
9
10          * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 132

1          DEPOSITION ERRATA SHEET
2  Case Caption:  Summit 6 LLC v. HTC Corporation, et al
3  Deposition Date:  January 29, 2015
4
5      DECLARATION UNDER PENALTY OF PERJURY
6      I declare under penalty of perjury that I have read
7  the entire transcript of my Deposition taken in the
8  captioned matter or the same has been read to me, and the
9  same is true and accurate, save and except for changes
10  and/or corrections, if any, as indicated by me on the
11  DEPOSITION ERRATA SHEET, hereof, with the understanding
12  that I offer these changes as if still under oath.
13  Signed on the __ day of ____, 20__.
14
15      _____
16      MARK T. JONES, Ph.D.
17
18  Subscribed to and sworn before me this ___ day of _____,
19  20__, in _____.
20
21  _____
22  Notary Public
23  My commission expires: _____, 20__
24  Notary Public Registration No. _____
25

## Page 133

1          DEPOSITION ERRATA SHEET
2
3  Page No.____ Line No.____ Change to:_____
4  _____
5  Reason for change: _____
6  Page No.____ Line No.____ Change to:_____
7  _____
8  Reason for change: _____
9  Page No.____ Line No.____ Change to:_____
10  _____
11  Reason for change: _____
12  Page No.____ Line No.____ Change to:_____
13  _____
14  Reason for change: _____
15  Page No.____ Line No.____ Change to:_____
16  _____
17  Reason for change: _____
18  Page No.____ Line No.____ Change to:_____
19  _____
20  Reason for change: _____
21  Page No.____ Line No.____ Change to:_____
22  _____
23  Reason for change: _____
24  SIGNATURE:_____DATE:_____
25      MARK T. JONES, Ph.D.

34 (Pages 130 to 133)

Dated:  February 6, 2015                    Respectfully submitted,

**MCKOOL SMITH, P.C.**

By:  /s/ Douglas A. Cawley
Douglas A. Cawley
Lead Attorney
Texas State Bar No. 04035500
dcawley@mckoolsmith.com
Theodore Stevenson III
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
Phillip M. Aurentz
Texas State Bar No. 24059404
paurentz@mckoolsmith.com
Ashley N. Moore
Texas State Bar No. 24074748
amoore@mckoolsmith.com
Mitchell R. Sibley
Texas State Bar No. 24073097
msibley@mckoolsmith.com
Richard A. Kamprath
Texas State Bar No. 24078767
rkamprath@mckoolsmith.com
Cory McAnelly
Iowa State Bar No. 28601
cmcanelly@mckoolsmith.com
Collen Bloss
Texas State Bar No. 24082160
cbloss@mckoolsmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Bradley W. Caldwell
Texas State Bar No. 24040630
bcaldwell@caldwellcc.com
Caldwell Cassady & Curry
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Telecopier: (214) 888-4849

**ATTORNEYS FOR PLAINTIFF
SUMMIT 6 LLC**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 6, 2015, all counsel of record who are

deemed to have consented to electronic service are being served with a copy of this document via

the Court's CM/ECF system.  Any other counsel of record will be served in accordance with the

Federal Rules of Civil Procedure.

*s/ Ashley Moore*
Ashley Moore